Worth James v. Commissioner.
James v. Commissioner
Docket No. 7584.
United States Tax Court
1947 Tax Ct. Memo LEXIS 267; 6 T.C.M. (CCH) 322; T.C.M. (RIA) 47075; March 26, 1947
*267 Income. - Held, that two machines were the subject of bona fide gifts by petitioner and that the rentals and recapture payments thereon were not petitioner's income and, further, that omission of such items from petitioner's returns for 1941 and 1942 was not due to fraud with intent to evade tax. Deductions. - Held, that certain amounts paid as bonuses by petitioner in 1941 and 1942 were paid and accepted in good faith. Held, further, that such bonuses did not constitute reasonable additional compensation for services rendered and respondent sustained in disallowing claimed deductions therefor. Held, further, that respondent failed to prove fraud with respect to such claimed deductions for the years 1941 and 1942. Depreciation. - Held, that the rates of depreciation determined by respondent are reasonable and proper. Income. - Petitioner conceded correctness of respondent's inclusion of a certain amount in income for 1942 as profits from completed contracts. Held, that fraud was not found with respect to petitioner's omission of such income from his 1942 return. Section 6, Current Tax Payment Act of 1943. - Held, that since no portion of the deficiency for 1942 was due to *268 fraud, respondent erred in not applying provisions of that section in determining the tax due for the years 1942 and 1943. Edward L. Wright, Esq., Pyramid Bldg., Little Rock, Ark., for the petitioner. John W. Alexander, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The respondent has determined deficiencies and penalties for the years and in the amounts as follows: Fraud
Year and Tax
Deficiency
Penalty
1941 - Income Tax
$ 6,135.22
$ 3,067.61
1942 - Income Tax
43,123.31
21,561.66
1943 - Income and Victory
Tax
15,732.80
None
$64,991.33
$24,629.27
The petitioner assigns error in the respondent's: (1) inclusion in petitioner's taxable income of the amounts of $1,150 for 1941 and $5,363.32 *269 for 1942 as rental income on certain trenching machines and also of the amount of $3,895.01 for 1942 as a capital gain from the sale of those same machines in 1942 under a recapture clause of the rental agreement; (2) disallowance of a deduction of $10,000 for each of the years 1941 and 1942 claimed as the total bonuses paid by petitioner to certain employees during each of those years; (3) disallowance of the amounts of $1,547.69 for 1941, $3,336.08 for 1942, and $2,218.55 for 1943 of petitioner's claimed deductions for depreciation on certain contracting equipment during those years; (4) determination of a fraud penalty for each of the years 1941 and 1942; and (5) failure to correctly apply the provisions of section 6, Current Tax Payment Act of 1943, in computing the net tax due for the years 1942 and 1943. The respondent, to sustain the asserted fraud penalty for each of the years 1941 and 1942, affirmatively alleges in his answer, that a part of the deficiencies for each of those years is due to fraud with intent to evade tax in that petitioner knowingly and willfully and with fraudulent intent; (a) omitted to report as taxable income the amounts of $1,150 for 1941 and $5,363.32 *270 for 1942 as rentals received on trenching machines and further omitted to report the amount of $3,895.01 for 1942 as the capital gain realized from the sale in 1942 of the same machines; (b) claimed a deduction of $10,000 for each of the years 1941 and 1942 as bonuses paid by petitioner to his two brothers, whereas, no such bonuses were actually paid and the entire transactions were fictitious and a sham for the purpose of defrauding the Government; and (c) omitted to report as taxable income for 1942 the amount of $25,091.12 representing profits realized from four contracts completed during 1942, the petitioner being on a completed contract basis. The respondent did not allege fraud with respect to petitioner's omission to report as income the amount of $5,899.09 representing profit realized from a fifth contract also completed in 1942. Further, and in the alternative, respondent alleges that if the bonuses in the amount of $10,000 were actually paid in each of the years 1941 and 1942 then such bonuses constituted excessive compensation to petitioner's brothers and as such are not deductible in determining petitioner's taxable net income for 1941 and 1942. At the hearing petitioner *271 conceded that the respondent, in his deficiency notice, correctly included in petitioner's income for 1942, the amount of $30,990.21 representing the total profit realized from five certain construction contracts completed during 1942, but not reported on petitioner's return for that year. However, petitioner does not concede fraud as to four of those five contracts, as alleged by respondent. Petitioner, a citizen of the United States, is engaged in the contracting business and maintains his principal office in the Pyramid Building, Little Rock, Arkansas. His income tax returns for the years involved herein were filed with the collector of internal revenue for the district of Arkansas. In 1927, at the age of 24 years, petitioner was first employed as a laborer on construction jobs. Subsequently, he became associated with G. C. McEachin and, on January 1, 1937, he became a partner in the firm of G. C. McEachin Construction Company. McEachin died in May 1937 and shortly thereafter petitioner purchased, from the decedent's estate, all of McEachin's construction equipment for approximately $5,000. Since July 1937 and including the taxable years in question, petitioner has continuously *272 engaged in the construction business, contracting mainly for the laying of sewer and water mains, under the trade name of Worth James Construction Company, a sole proprietorship, with offices located at Little Rock, Arkansas. From time to time petitioner acquired additional machinery and equipment and at the end of 1943 he owned depreciable machinery, autos, and office fixtures having a cost or other basis totaling approximately $81,250. For the years 1937 to 1943, inclusive, petitioner reported on his tax returns as net profits from his business as contractor the following amounts: $3,679.75 for 1937; $2,640.08 for 1938; $6,491.73 for 1939; $14,322.21 for 1940; $23,166.18 for 1941; $59,615.31 for 1942; and $123,600.74 for 1943. The petitioner has two brothers, H.B. ("Ben") James, who is five years older than petitioner and Vernal James, who is four years younger than petitioner. The petitioner and his brothers were born in a small community near Barber, Arkansas, and they each received a country school education. From 1927 to 1937 Vernal worked with petitioner, as a fellow employee, on construction jobs. Since petitioner went into business for himself in July 1937 Vernal has been *273 employed by petitioner during the major portion of the time, and during the taxable years Vernal was a field superintendent for petitioner and also at times operated construction equipment. From 1921 until 1925 Ben owned and operated a blacksmith shop. From 1925 until its destruction by fire in December 1937 Ben owned and operated a combination service station and garage and a country grocery and feed store. He repaired cars, trucks, and farm machinery and was a good mechanic, welder, and machine operator. Ben was first employed by petitioner in July 1938 and during the major portion of the time from then to and including the taxable years Ben has done actual repair work on most of petitioner's equipment and has been equipment superintendent with supervision of the repair of all of petitioner's equipment, including draglines, trenching machines, trucks, cars, etc. At times Ben has acted as a field superintendent and, also, at times has operated construction equipment. At various times both prior and subsequent to July 1938 the three brothers discussed the matter of forming a partnership among themselves to engage in the construction business as soon as Ben and Vernal could acquire *274 sufficient funds to contribute their share in financing such a business. During 1938 to 1940, inclusive, Ben and Vernal worked for petitioner for less compensation than the prevailing wages paid for their respective type of skilled labor. At some undisclosed time prior to September 1941 there was a general understanding, but no definite agreement, between the brothers that when the petitioner's business began making substantial profits the petitioner would pay Ben and Vernal bonuses for their services which bonuses could be used in their proposed partnership. During the first part of 1941 petitioner had a contract for the laying of 41,000 feet of house connection sewer lines. He found that his equipment would not do the job and he had to start the trench digging by hand labor. In March 1941 petitioner purchased a small obsolete Parsons 21 trenching machine for $200 from the Crossett Lumber Company which had discarded it. Repair parts for that machine were not obtainable from the manufacturer and petitioner told Ben that if he could repair the machine to do the sewer line job he could have the machine. At the petitioner's expense and with parts salvaged from junk yards and some welding *275 Ben put the trenching machine in operating condition, which enabled the petitioner to complete the original 41,000 foot sewer line job and also an additional 24,000 feet of similar work. In about August 1941 petitioner gave Ben the Parsons 21 trenching machine as he had promised and at that time in its repaired condition the machine had a fair market value of about $1,200. At about the same time petitioner gave Vernal an obsolete Austin, Model 110, trenching machine which petitioner had acquired as part of the equipment purchased from the McEachin Estate in 1937 and which had little or no market value at the time of the gift because it was constantly breaking down. Those gifts were not evidenced by any written instrument. At the time the gifts were made it was thought that those two machines with repairs could be used on small jobs in starting the partnership business which the brothers contemplated forming. On September 1, 1941, the petitioner, Ben, and Vernal executed a written agreement forming a partnership known as James Brothers Construction Company to engage in general contracting business and providing, inter alia: that Ben and Vernal contribute $5,000 each and petitioner *276 contribute $10,000 to be used as working capital; that the partnership pay the usual rentals on any equipment furnished by either of the partners; that petitioner provide any necessary bonding or banking credit, furnish office personnel, make all estimates and have complete authority in the operation of the business; that all checks written on the partnership account be issued from the home office, but that Ben and Vernal could issue checks provided they informed the home office as to the amounts thereof; that profits and losses be divided 50 per cent to petitioner, 25 per cent to Ben, and 25 per cent to Vernal; and that the agreement remain in effect until dissolved by the partners. At the time such partnership agreement was executed no mention was made of any specific amount of bonuses to be paid to Ben and Vernal for the year 1941 and the brothers did not know when they would be able to actually operate as a partnership. The partnership agreement remained in effect during the taxable years, but during that time the partnership never obtained any contracts or engaged in any business because the war contracts were too large for the brothers' finances and available equipment to handle *277 and also because subsequent to 1941 Vernal was subject to being drafted at any time for military service although he was deferred a number of times until May 1944. During the taxable years the petitioner secured contracts either as his individual business or in association with other contractors. In the fall of 1941 and subsequent to petitioner's gifts of the machines to his brothers, there arose a great demand for almost any kind of earth-moving equipment. The petitioner, acting for and on behalf of his two brothers, handled negotiations for the leasing of their respective trenching machines to Ford, Bacon & Davis, Inc. which had a contract with the United States Government for the construction of an ordnance plant at or near Little Rock, Arkansas. On October 18, 1941, Ben James, as owner and lessor, and Ford, Bacon & Davis, Inc., as lessee, signed a written "Equipment Rental Agreement With Recapture Provision" for the rental of Ben's Parsons 21 trenching machine at a stated rental of $550 per month and a recapture by the United States Government value of $6,500. Also, on October 18, 1941, Vernal James, as owner and lessor, and Ford, Bacon & Davis, Inc., as lessee, signed a written *278 "Equipment Rental Agreement With Recapture Provision" for the rental of Vernal's Austin, Model 110, trenching machine at a stated rental of $600 per month and a recapture value of $7,500. Each of those agreements, provided, inter alia, that the United States Government had the option of purchasing the equipment by paying to the lessor the difference between the recapture valuation thereof plus one per cent per month for each month the equipment had been used and the total rental paid thereon, and upon such payment the lessor was required to deliver to the Government clear title to such equipment. As a part of their respective agreements, Ben and Vernal each executed a sworn affidavit that he was the owner of the rented equipment and that it was free of any liens or encumbrances. The 1941 rentals on those two machines were paid by checks drawn by Ford, Bacon & Davis, Inc., payable to Vernal James and Ben James, respectively, who received such checks and endorsed them for the purpose of either cashing them or depositing them in their bank accounts. The petitioner did not receive any portion of such 1941 rental payments and did not report any portion thereof on his 1941 tax return. *279 On or about December 1, 1941, after completion of certain construction jobs petitioner had contracted for, he advised Vernal and Ben that anticipated profits for that year would enable him to pay each of them a $5,000 bonus. On December 31, 1941, petitioner drew two checks on the Worth James Construction Company payable, in the amount of $5,000 each, to Ben and Vernal James, respectively, as a bonus for 1941. On the same date, petitioner endorsed each of those checks for his brothers, respectively, for deposit in a bank account which he then opened at the Peoples National Bank in Little Rock, in the name of James Brothers Construction Company, because it was contemplated that such funds would be used in the brothers' partnership business under the September 1 agreement. Ben and Vernal both had knowledge of such checks and consented to such deposits. Petitioner was the only person authorized to sign checks on that account because under the brothers' partnership agreement he was to supervise the operation of the business, but Ben and Vernal both understood that, until the partnership actually began operations, the money on deposit in that bank account belonged to them and they could *280 have checks drawn on such account for their individual benefit up to the extent of their respective credit therein. The petitioner did not deposit any of his own funds in that account because the brothers' partnership had not started operations and until it did so he needed his funds in his own business. The $5,000 bonus paid by petitioner to Ben and Vernal, respectively, on December 31, 1941, was paid and accepted in good faith by the brothers and the amount thereof was agreed to among themselves, but was not computed or arrived at on any particular basis other than the general understanding that a bonus would be paid when the earnings of petitioner's business justified it. Petitioner did not consult anyone, other than his brothers, as to the reasonableness of such bonuses. During 1941 Ben worked for petitioner from February 24 through March 31, for about 60 cents per hour, and from April 1 through November 22, for about 75 cents per hour, or for a total compensation of $2,059.39 for the approximate nine months he so worked in 1941, exclusive of the bonus. Prior to February 24, 1941, Ben was temporarily employed for about 30 days by Tarleton-McDonald Construction Co. at a higher *281 pay per hour than petitioner paid, and during December 1941 Ben was temporarily employed by Ford, Bacon & Davis, Inc. as a trenching machine operator at $1 per hour. Ben worked for petitioner during 1941 for less than he did for the other contractors because employment by petitioner provided steady work every day while in his other employments there might be a week or longer when he would not work; and, further, because he looked forward to operating a partnership with petitioner and Vernal. During 1941 Vernal worked for petitioner for 50 cents per hour for the first two weeks in March and thereafter until November 19 for $45 per week, or for a total compensation of approximately $1,700 for the approximate eight and one-half months in 1941, exclusive of the bonus. Vernal received as compensation the average compensation received by other foremen employed by petitioner. During January and February 1941 Vernal was temporarily employed by Tarleton-McDonald Construction Co. at about $60 per week and during December 1941 Vernal was temporarily employed by Ford, Bacon & Davis, Inc. at about $60 per week as a field superintendent. Petitioner did not pay bonuses to any other employee besides *282 Ben and Vernal and the latter were not working for petitioner during December 1941 when the amount of $5,000 bonus was determined and paid. The $5,000 bonus paid by petitioner to each Ben and Vernal on December 31, 1941 constituted excessive and unreasonable additional compensation, but such bonus was paid in good faith and without fraudulent intent to evade income taxes for the year 1941. During 1942 the petitioner, acting with the knowledge and consent of Ben and Vernal, drew checks on the James Brothers Construction Company bank account. Petitioner withdrew $5,000 on January 13 and a like amount on February 3, as loans for use in financing a construction contract in his individual business, and, on April 13, 1942, he repaid these loans by depositing $10,000 in such bank account. During 1942 and also 1943 petitioner drew checks on that account for the personal benefit of Ben and Vernal, respectively. On January 31, 1944, that account was closed out in contemplation of Vernal being inducted into the naval service and Ben received $5,206.44 and Vernal received $7,172.80, representing the balance of their credit, respectively, in such account. On April 23, 1942, Vernal James executed *283 a "Bill of Sale and Assignment" and on April 29, 1942, Ben James executed a similar instrument, each of which, respectively, provided that under the terms of the equipment rental agreement with recapture provision dated October 18, 1941 rental payments had been made in the aggregate amount of $3,580 to Vernal and $3,354.98 to Ben on their respective trenching machines and, further, that in consideration of Vernal's receipt of the sum of $4,370 and Ben's receipt of the sum of $3,600.02 representing the balance payable to each of them under the terms of such agreement, Vernal and Ben, respectively, thereby transferred all his right and title in such equipment to the United States Government, and, also, covenanted that he was the lawful owner thereof free and clear of all encumbrances. The checks for the balance due on the recapture or purchase of those two machines, respectively, and also the checks for the rental payments thereon during 1942 were drawn by Ford, Bacon & Davis, Inc. payable to Vernal James and Ben James, respectively, who received such checks and endorsed them for deposit in the James Brothers Construction Company bank account. The petitioner did not receive any portion *284 of such 1942 rental or purchase payments on Vernal's and Ben's trenching machines, nor any benefit from such payments and he did not report any portion of such payments on his tax return for 1942. Subsequently, Ben and Vernal each contracted for the purchase of a new combination dragline, shovel, and back haul at a cost of $12,000 for delivery when manufactured. During 1942 there arose an acute demand for skilled labor, mechanics, and supervisors in construction work. During 1942 petitioner employed Ben for the entire year at $1.25 per hour with time and half for overtime or a total compensation of $4,741.15 for 1942, exclusive of a bonus, and such compensation was at the rate of pay established by Government contracts for Ben's type of skilled labor. During part of January 1942 Vernal was employed by Ford, Bacon & Davis, Inc. at $70 per week, but during the entire remainder of 1942 he was employed by petitioner for a straight salary of $70 per week or a total compensation of $3,680 for 1942, exclusive of a bonus, and such compensation was at the rate of pay established by Government contracts for Vernal's type of skilled labor. On December 29, 1942, petitioner drew two checks *285 on the Worth James Construction Company payable in the amount of $5,000 each to Ben and Vernal James, respectively, as a bonus for 1942. Petitioner did not pay a bonus to any other employee. On December 30, 1942, Ben and Vernal endorsed their checks and cashed them at the bank and pocketed the money. Ben and Vernal retained such money in cash for several days and then Ben buried $4,000 and Vernal buried $5,000 in separate receptacles in the basement of Ben's house where it remained until October 15, 1945, when it was dug up and placed in their respective bank accounts. Petitioner had no knowledge of Ben and Vernal burying such money until October 1945. Petitioner never received any portion of those 1942 bonuses nor derived any benefit therefrom. Such bonuses were paid by petitioner and accepted by Ben and Vernal in good faith. The $5,000 bonus paid by petitioner to each Ben and Vernal on December 29, 1942 constituted excessive and unreasonable additional compensation, but such bonus was paid in good faith and without fraudulent intent to evade income taxes for the year 1942. For the taxable year 1943 petitioner paid a $5,000 bonus to each Ben and Vernal and claimed a deduction *286 therefor on his return for that year. Such deduction has been allowed and there is no controversy with respect thereto in this proceeding involving the year 1943. On his tax returns for each of the years 1941, 1942, and 1943, petitioner claimed certain amounts for depreciation on his machinery, equipment, autos, trucks, and trailers, and respondent has disallowed the following portions of such claimed deductions: $1,547.69 for 1941, $3,336.08 for 1942, and $2,218.55 for 1943. In his determination for each of the years in question the respondent computed depreciation, at a rate of 25 per cent on construction equipment and machinery acquired prior to December 31, 1940, and at a rate of 33 1/3 per cent on trucks and autos acquired prior to December 31, 1940. These were the same rates as used for the year 1940. As to various equipment acquired by petitioner subsequent to December 31, 1940, respondent used a rate of 20 per cent, except in the case of one piece of machinery, 30 per cent on all construction machinery, and a rate of 33 1/3 per cent, except in the case of two trucks and two trailers, and 25 per cent on all autos and trucks. Since petitioner entered the construction business *287 for himself he has followed the practice of setting up depreciation at the rate of 25 per cent on all of his various types of construction equipment and on the new equipment acquired during 1941 and 1942 petitioner followed the same practice as to the rate of depreciation. During the years 1941, 1942, and 1943 petitioner's construction equipment was subjected to hard usage over rough terrain, but it has been maintained in good shape through constant repair, new parts, and welding. Some equipment has been practically rebuilt, which would have been uneconomical in normal times because such extensive repair work cost more than new machinery which was difficult to obtain during those years; however, the cost of such repairs was claimed and allowed as a deduction for expense of operating petitioner's business. All of petitioner's construction equipment on hand at the beginning of 1941 was still in use during 1945. The rates of depreciation as determined by respondent for each of the years 1941, 1942, and 1943 for petitioner's various construction equipment, autos, and trucks were reasonable and proper. Over the period of years since petitioner entered business for himself he has employed *288 F. A. Sweeney to maintain all of his books and accounts. For each of the years in question petitioner's income tax return was prepared by the accounting firm of Russell and Brown, Little Rock, Arkansas, on the basis of information supplied by F. A. Sweeney and petitioner's records. The return for each of those years was not false and fraudulent with intent to evade tax. In his determination of petitioner's tax liability for the years 1942 and 1943, the respondent determined a deficiency in income tax of $43,123.31 and a 50 per cent fraud penalty of $21,561.66 for the year 1942 and a deficiency in income and victory tax of $15,732.80 for the year 1943, and stated that: The provisions of Section 6 of the Current Tax Payment Act of 1943 are not applicable if an addition to income tax for either of the taxable years 1942 and 1943 has been made by reason of fraud. Inasmuch as it has been determined that your return for the taxable year ended December 31, 1942 was fraudulently filed the $15,732.80 shown on line 21 (b), page 4 of your 1943 return has been considered as a payment in part of your 1942 tax liability rather than a credit against your 1943 tax. Opinion The issues herein *289 are purely factual questions, including the allegations of fraud as to which respondent has the burden of proof. On the first issue, the facts clearly establish that petitioner made a bona fide gift of an obsolete Parsons trenching machine to his brother Ben and an obsoleteaustin trenching machine to his brother Vernal in August 1941, with the thought that those machines, with repairs, could be used on small jobs in starting the partnership business which the brothers contemplated forming; that thereafter a great demand arose for earth moving equipment of almost any kind and, on October 18, 1941, Ben and Vernal, respectively, as the owner, leased his trenching machine to Ford, Bacon & Davis, Inc. under an equipment rental agreement with recapture provision; that pursuant to such agreement Ben and Vernal, respectively, transferred his title to his trenching machine; that the rentals for 1941 and 1942 and the payments made in 1942 under the recapture provision to Ben and Vernal, respectively, were received by them as their own money; and that petitioner did not receive any portion of such rentals and recapture payments nor any benefit therefrom. On the facts herein, we conclude that *290 petitioner did not own these two trenching machines, or any interest therein, subsequent to August 1941; that no portion of the 1941 and 1942 rentals or the 1942 recapture payments constituted income to petitioner in those years; and that petitioner properly omitted such rentals and recapture payments from his income tax returns for 1941 and 1942. We hold that respondent erred in including in petitioner's taxable income the amounts of $1,150 for 1941 and $5,363.32 for 1942 as rental income and the amount of $3,895.01 for 1942 as a capital gain from the sale of those two trenching machines and that he erred in determining that petitioner's returns for 1941 and 1942 were false and fraudulent with respect to petitioner's omission of those items from his tax returns for those years. On the second issue with respect to petitioner's claimed deductions of $10,000 in each of the years 1941 and 1942 as bonuses paid to his brothers Ben and Vernal for services rendered, the facts establish that the amounts of such claimed bonuses were actually paid by petitioner and received by his brothers, respectively, in good faith, and that petitioner never received any portion of such monies or benefit *291 therefrom. However, the petitioner has failed to show that each bonus in the amount of $5,000, or any particular portion thereof, for each of the years 1941 and 1942 constituted reasonable additional compensation for the services rendered by each of his brothers, within the meaning of section 23 (a), I.R.C., which provides for a deduction of "ordinary and necessary expenses * * *, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *". On the contrary, from the facts of record, we conclude that such bonuses for the years 1941 and 1942 constituted excessive and unreasonable compensation and that, therefore, the respondent correctly disallowed the claimed deductions thereof. We further conclude that respondent has failed to prove fraud with intent to evade tax on the part of petitioner in claiming such deductions, for the facts herein are consistent with an honest purpose, and we hold that respondent erred in determining that petitioner's returns for 1941 and 1942 were false and fraudulent with respect to those claimed deductions. On the third issue, with respect to respondent's disallowance of certain *292 portions of petitioner's claimed deductions for the years 1941, 1942, and 1943 for depreciation on petitioner's contracting equipment, including autos and trucks, the petitioner has failed to prove error, and on the facts of record we conclude that the rates of depreciation as determined by respondent for each of these years were reasonable, within the meaning of section 23 (1), I.R.C., which provides for a deduction of "a reasonable allowance" for depreciation "of property used in the trade or business". On this issue we sustain respondent's determination. There was no allegation of fraud with respect to this issue. The petitioner has conceded that he omitted from his return and that respondent has correctly included in his taxable income for 1942 the amount of $30,990.21 representing the total profit realized from five certain construction contracts completed during 1942. Respondent has alleged fraud with respect to petitioner's failure to report profits totaling $25,091.12 realized from four of those five contracts. Petitioner denies any fraudulent intent in the omission of such items from his 1942 return, and the facts of record as to the preparation of *293 petitioner's returns, including the year 1942, are consistent with an honest purpose on the part of the petitioner. No proof has been submitted on this question of fraud other than the mere omission from petitioner's income tax return of the item. We hold that respondent correctly included the amount of $30,990.21 in petitioner's taxable income for the year 1942, and, further, that respondent erred in determining that any portion thereof was omitted from petitioner's 1942 return with fraudulent intent to evade tax. The last issue involves the application of the provisions of section 6, Current Tax Payment Act of 1943, (which provides for certain relief from double payments in 1943) in computing petitioner's tax liability for the years 1942 and 1943. The respondent did not apply such provisions because of his determination that a portion of the deficiency for 1942 was due to fraud. Since the petitioner's 1942 return was not false and fraudulent with intent to evade tax, the respondent erred in his determination, and we hold that section 6, supra, be applied in the recomputation under Rule 50, in computing petitioner's net tax due for the years 1942 and 1943. There is no fraud penalty *294 for either of the years 1941 and 1942. Decision will be entered under Rule 50.